The next case is James Wisner v. Piedmont Bank. William Diehl is here for the appellant, Piedmont Bank. G. Frank Naso IV is here for the appellee, James Wisner. And once you're all settled there, Mr. Diehl, you may begin. Good morning, judges of the panel, and may it please the court, my name is William Diehl. I represent the appellant, Piedmont Bank. Your Honor, the case before you today is a disposability case brought under Section 5386 of the Bankruptcy Code, which provides, among other elements, that a creditor must show that has a sufficient property interest has been harmed by willful and malicious injury. And the crux of this case today is when, if at any time, did the Piedmont Bank acquire a property interest in a certain stock certificate. We would submit to the court that Piedmont obtained a sufficient interest on two days. Either on October 24th, 2013, when a levy action was served upon the defendant and debtor, Mr. Wisner, or alternatively on March 14th, when Mr. Wisner voluntarily surrendered the stock certificate to the Piedmont Bank in contemplation of a settlement agreement and to avoid a conjunction hearing that was to take place the following day. The Bankruptcy Court, in its order, concluded that Piedmont Bank obtained an interest in the stock certificate the date of service, October 21st, 2013. The District Court disagreed and found that no interest was obtained for the service of this levy action. Then working to the March 14th date, the District Court contended that even if an interest was passed with a voluntary turnover of the stock certificate, that there was no willful or malicious conduct that happened. Georgia law seems to be clear that you've got to have a charging order entered to authorize a seizure before you have a vested property interest sufficient to seek non-dischargeability of the debt, Wisner wrote. How do you get around this statute, 11-8-112 sub a? Certainly, Your Honor. But there was no charging order, right? You agree with that? Well, there was no order, and I do want to correct. The charging order applies to an LLC interest. We were seeking a levy of corporate stock. But I agree with you that the subsection that applies here in the UCC is 11-8-112. That subsection provides for the reaching of the debtor's interest. The debtor's interest is the interest of the debtor, possession control. It is not a lien interest. And the subsection does not speak at all to the attachment of a lien, but rather speaks to the possession of the debtor. And if we think about this in a traditional lien context, we think about maybe an automobile. The debtor has an interest in the automobile. The debtor owns the automobile. The creditor has lien rights to the automobile. The bank would have lien rights. It never owns the automobile. It has the right to repossess the collateral, to work through the process of sale. But it never at any point owns the automobile unless it wins a bid. If the collateral is repossessed, sold, and the bank wins the bid, it will acquire the collateral. But it obtains the collateral through the process of winning that bid. And so subsection A does not provide for the attachment of a lien. It provides that the debtor's control is divested once there is an attachment, and that is execution of the lien. It says the interest of a debtor in a certified security may be reached by a creditor only by actual seizure of the security certificate by the officer making the attachment levy. That seems clear. Again, Your Honor, we contend that that does not involve the attachment of a lien. And I want to stress that the term attachment that's used in this subsection is really just the use of the term execution of a levy. In fact, if attachment is looked up in Black's Law Dictionary, the court would find it's defined as the seizing of a person's property to secure a judgment to be sold at satisfaction of the judgment. What's the best case that you have to support the proposition that you're making? Yes, Your Honor. So we believe that there's two cases, and it begins with the Fidelity case. That's Fidelity and Deposit versus Exchange Bank of Macon. And there the court is talking about another choose in action, and Georgia law is clear that a stock certificate is a choose in action. The court says an additional proceeding is necessary to fix the lien. The choose in action can be reached by some collateral proceeding instituted for the purpose of impounding the choose in action so that it can be applied in satisfaction of the judgment. Neither of those cases dealt with the seizure of stock under 11-812. I agree with you, Your Honor. They involve statutes that are not at issue here. I agree with you, Your Honor. They do not involve the levy of stock, but they all involve chooses of action. And what's distinct about chooses of actions is that in order for a creditor to obtain that choose of action by levy or execution or, excuse me, to levy or execute that choose in action, there has to be some statutory predicate. And we believe the statutory predicate is provided in the UCC. What's important about this language that's used in fidelity and later used in prodigy centers is that it states that a collateral proceeding must be instituted for the purpose of impounding an action so that it can be applied. And so it's clear that the fidelity deposit case envisions that an action is filed, that action affixes the lien. But the action itself does not cause for the levy or seizure. The levy or seizure is done on account of that action. And that's exactly what we're talking about. The fidelity case also goes on to say that the property, basically the chose in action, is still subject to the dominion and control of the debtor until it has been so seized by the courts for the purpose of appropriating it to the payment. And here, it hasn't been seized by the courts. Only the levy action would have been served, right? So how do you meet that language in fidelity? Because the UCC provides us a remedy and a procedure for attaching our lien and for causing the levy and execution of this stock certificate. And that's provided in subsection 112, subsection E, where it states that a creditor is entitled to aid from a competent jurisdiction by injunction or otherwise. And that's exactly the process that we initiated here in this case. And what's important is that Piedmont Bank served this petition. In its petition, it had a paragraph that said, Mr. Wiesner owns this stock. Mr. Wiesner denied that allegation, thereby preventing us from obtaining a judgment on the pleadings, and thereby requiring discovery, requiring additional time, and giving him the opportunity to waste the value of the corporate stock through fraudulent transfers. We initiated that process, and Mr. Wiesner falsely denied an allegation to allow himself the opportunity to sell the assets of this company. I want to address the effect of turning over the stock certificate to Piedmont. Mr. Wiesner turned over the stock certificate with an impending injunction. We believe that turnover gave Piedmont a sufficient property interest, either by allowing it to have title of the certificated security or a security interest. Either would be sufficient for us to maintain a 523A action. The bankruptcy court concluded in its order that the only conceivable purpose of this turnover was to provide security for the satisfaction of the judgment. The district court didn't address that issue because it said that there was no malicious or willful act that occurred after the turnover. That is both factually incorrect and a re-characterization of the bankruptcy court's findings of fact, an improper re-characterization. It's factually incorrect because after March 14th, on March 24th, inventory of Atlanta Arms was sold for $209,000. On May 1st, inventory again was sold for $100,000. Then over the process up until January 2015, Mr. Wiesner caused Atlanta Arms to release a security interest in favor of his wife on real estate that could have been used to collect. We believe that that mischaracterization was incorrect and the bankruptcy court made a clear finding of fact. All right. Thank you, Mr. Deal.  We'll hear from Mr. Naso on behalf of Mr. Wiesner. Thank you. Your Honor, I think a lot of this really arises because the bankruptcy court in its initial ruling had determined that the filing and service of the petition in October acted almost as a notice of a levy. It did that in reliance upon the Tompkins case and the 1910 statute 6035 of the Civil Code. The problem from the bankruptcy court's perspective that the district court identified was that that statute had been repealed by the enactment of the Uniform Commercial Code. There was no longer any provision that said that giving notice of a levy to the corporation operates in any way as a levy. And if you go back to the cases under the old code, they always say the same thing, which is that the lien of the judgment never attaches to stock until there is an actual levy and notice. Under the old Civil Code 6035, it was a notice to the corporation and an actual levy on the stock. Now, the code only provides one form of accomplishing a levy, and that is through 11-8-112. When you say levy, there's got to be a charging order. A levy is when the marshal or the sheriff actually takes physical possession of the stock and endorses the stock as having been levied, and then records that on the FIFA, identifies that as having been taken, then is taken and sold at the courthouse steps. That's what a levy is. And until that's done, the lien of the judgment does not attach to the stock. There's some potential for abuse. I mean, did Georgia, the Georgia legislature intend this result that all you've got to do is, you know, if you file an action to levy the assets, that puts the debtor on notice that they should consider selling those assets? So... Your Honor, in this case, the asset itself was not sold. One of the things that seems to be lost is Atlanta Arms and Ammo did not owe the bank any money. Atlanta Arms and Ammo wasn't liable to the bank for the debt. And the assets that Atlanta Arms and Ammo sold was never collateral for the debt and could not have been reached by the bank to satisfy the debt. It is a non-debtor company engaging in a transaction. Well, he owned the stock in it. He worked for the company. That was his sole source of income. He was the debtor. He had a $5 million judgment. And he clearly wasted the value of the company as soon as he saw Piedmont was coming after him. The record screams that. Well, I would disagree in the sense that the process of the sale had actually started before the bank even got its judgment. And that was in the record itself. But in this case, it doesn't change the fact that the judgment has to attach... ...on August 20. And the state court didn't issue the judgment to August 22. But he was sued on June 22 in the Supreme Court of Newton County on the debt. And so as soon as he got sued on that debt, knew they were coming after him, he started negotiating confidentially with Mr. Kuhn to buy the stock. Right? That's pretty... It was actually a transaction... Acquiring the assets. Excuse me. Excuse me. Acquiring the assets. So... It was to... Yes. It was to get rid of all the assets so the stock was worth nothing. That's basically what he did. That's what the bankruptcy court found. The bankruptcy court found it was substantially certain to harm the value of the stock. Yes. That he depleted intentionally and fraudulently completed, depleted the assets of the company. Now, it may be they didn't do their, get there quick enough before he did it. But that's what happened here. I believe this is correct. The bankruptcy court didn't say it was done fraudulently. It was just done that he knew or should have known that it harmed the value of the stock. Okay. And that's how you have to show to have a non-discharge. That does. Okay. Whatever they met the test of the non-discharge ability. That's right. So, let's go to the turnover. I understand at the time, so it's very clever. It was an injunction that the court's getting ready to do something. So, I'll give you the stock. So, but they don't endorse it on the back. But I don't understand why that's not enough. You don't have to have unqualified property interest. You just have a sufficient property interest in the stock. Why is it not possession nine-tenths of the law? I know it's not. The bylaws say this and that. And I know it's not a completed transaction. But why is that not sufficient, a culpable property interest at the time of the turnover of the stock under the circumstances we have here? Because the transactions that the bankruptcy court found caused the devaluing of the stock had occurred before the possession was ever obtained. Okay. What about, and he's correct, that after he turned over the stock, specialty paid $209,000 for the inventory on March 24, and then specialty paid $100,000. I mean, your client, or I'm not sure who your client is, but I guess it's Mr. Wisner. He got $300,000 out of the company. He gave the stock, and then he got checks for the inventory. The inventory that that related to, and I think the testimony was clear, and I put this in my brief, was inventory that was acquired after the initial transaction. It was not inventory that was in existence at the time that the transaction took place. So this was inventory. What transaction? The sale of the assets took place on February 6th. The inventory that they're talking about here is inventory that was being acquired under the Transactions and Services Agreement after the sale of the assets. So that was a different, so that was not inventory that was being transferred at the time of the initial sale on February 6th. But then the state court held them in contempt for doing that. Excuse me? The state court then issued a contempt order against Mr. Wisner for, in the levy action, because he was depleting the assets. You did enter the contempt order. Yeah. But that doesn't mean that the lien had attached at the time that these transactions took place. I understand that. I'm talking about whether after the turnover of the stock, there was any further depletion of the assets of the company. The bank's court did not find that the transfer of the inventory after the date was done with the intention of harming them or with the substantial certainty that it harmed the bank's interest in the stock, just as the bank's court did not find that the release of the real estate lots for their release price was done with the intent to harm the bank's interest in the stock. And so that evidence was presented at the court, and the court did not specifically find that. The only thing that the court found that was certain to devalue the stock was the sale of the assets on February 6th, the distribution to pay taxes on February 11th, and the distribution of the 600-something thousand dollars on February 26th, which ultimately was put into an investment vehicle and paid to the bank primarily. The bank got most of that money, and the evidence established that Mr. Weiser himself did not get any of that money. So that $600,000 overwhelmingly, I think it was 490 plus thousand of it, went to the bank. That's the Caribou investment? Yes, that's the Caribou investments. What was that? That was an investment vehicle that it's a series, it was a series LLC that people put, that each person, instead of having a joint ownership, I think they each had a series LLC, so they each had, they put their own assets in and tried to generate revenues for it. And it wasn't like a cotton pot. I think it's a special kind of LLC that's set up, I think, under Delaware law. But the reality is that the money that was put in there, $493,000 or so, was paid to the bank, and then none of it ended up being paid to Mr. Weiser. He didn't benefit from it. But those are the only conduct that the court identified as leading to a non-dischargeable debt. And at the time those transactions took place, the bank did not have a lien on the stock because it had not levied on the stock. And I understand the courts stated here that, well, if you file an action to levy on the stock, does that give notice to the defendant? My response is there's no requirement that you file an action to initiate a levy. And this is why it's different than the prodigy cases and the cases that are relied upon by Piedmont Bank. You can just walk into the office, take the stock, and endorse it, and sell it on the courthouse steps without any kind of... You mean you can do self-help? Yes. So that's what you're asking. They should have just gone into his office and taken his stock. Well, I'm thinking... That's bizarre. They would have. And that would have... And I got arrested. That would have fixed their lien. But the bottom line is the initiation of the action by itself does not constitute a levy on the stock. The levy on the stock is done solely by a sheriff endorsing the levy on the FIFA itself. Georgia law is very clear about that. And the lien does not attach until that is done. And whatever issues there are with what happened, and I understand the bankruptcy court's concern, it doesn't change the fact that you have to have a cognizable property interest at the time that the conduct occurs in order to form a 523A6 claim. And that clearly was not present in this case, and the district court rarely ruled that way. And the district court's order should be accordingly affirmed. I think we have your argument, Mr. Naiso. Thank you. Mr. Diehl, you've reserved some time for rebuttal. Yes, thank you, Your Honor. Regarding the sale of the assets, the court noted there absolutely were assets that were sold after the voluntary turnover of the stock certificate. And my colleague notes that there was some determination as to whether or not each action was willful or malicious. And the court can review the bankruptcy court's order. There is no such determination. And if we look at the order, in fact, the conclusion here in the holding is that the court stated, I cannot help to conclude that draining the company of all of its assets and distributing the rest of its value was malicious. The bankruptcy court never at any time made an independent finding of fact that the reported sale occurred on February 6th or that it occurred on February 24th. In fact, the bankruptcy court notes that there is some ambiguity as to whether or not that occurred. And the bankruptcy court notes that on April, that the agreement set an effective date of April 1st, which would have been beyond the time after we received the stock certificate. The bankruptcy court also knows and noted in its order that there were these subsequent transactions that occurred after the voluntary turnover of the stock certificate. The bankruptcy court's conclusion regarding willful and malicious, and I note that whether or not it's willful or malicious was never appealed and hasn't been an issue that has been noticed with an factual issue that was appealed to the district court. The bankruptcy court's holding was that after October 21st, which is when the service of the levy occurred, that any action thereafter that drained the company of its assets and distributed the rest of its value was willful and malicious. That was the holding of the court. The court didn't need to make a factual determination as to each action, whether or not it was willful or malicious. The court said that it was. And importantly, the bankruptcy court did not liquidate the damages. The bankruptcy court did not state Mr. Wisner depleted the value of this stock certificate by this amount on this date. What the bankruptcy court did is it said there's a pending action still in Newton County Superior Court. Bankruptcy court said that court is better suited to liquidate the damages and to say exactly how much was damaged. And so that court is the proper court where it can be decided the extent of the damage. And the bankruptcy court was just saying everything after this was damaged to Piedmont. Does the case need to be remanded to the bankruptcy court for any fact findings in your view? If this were to conclude that we obtained a security interest on October 21st, it would not need to be remanded. The bankruptcy court's order would stand. The district court would be reversed. Bankruptcy court's order would stand. If this court were to conclude, however, that March 14th is the date at which Piedmont obtained a security interest, then it would need to be remanded. And the bankruptcy court would make a finding of fact as to whether or not there was willful or malicious conduct that occurred after March 14th. It never made that finding of fact. And the district court making that finding of fact for the bankruptcy court was an error. I also want to address the argument that there is no requirement that we file an action and that a self-help remedy might be available.  Now, if this stock certificate was held by, for example, the company itself or by some stockbroker, we could send a levying officer to that stockbroker or to the corporate office, to the CEO, under 11.8.112. Those are subsections B, C, and D. We could do that. That would be service of process. The levying officer would obtain a stock certificate, and then the levying officer would levy it. It would go through an auction and be sold and be entitled to the proceeds. But in order for us to obtain the stock certificate from the debtor, we must go through the process that's set forth in subsection E, which is to request assistance by the court, by injunction or otherwise is what the statute says. And that's exactly what Piedmont did. And had Mr. Weisner admitted, as he should have, that he had the stock certificate, we'd have had a judgment on the pleadings. This would have been a judgment by December of 2013. We have your argument. Thank you, Mr. Diehl. Thank you. And the court will be in recess for 15 minutes. All rise.